I'd like to turn to our next case today, at least from our vantage point. There we go. Starting to see some of our counsel here this morning. Good morning. We're going to turn to our next and final case, which is 20-56230, Produce Capital Group v. West Central Produce. I understand the accolades have agreed to split their time, and we will set the clock. Based on the amounts that you've requested. And with that, we will hear from the appellant. Good morning, sir. Good morning, Your Honor. May it please the Court. Jason Klonowski on behalf of the appellant, Produce Capital Group. Your Honor, as we know, the appellee in this case is from the HSBC bank. We do know the case does kind of stem out of West Central Produce. So there are three things I want to talk about that I intend to talk about and answer any questions from the Court. And the first is what I think is probably the most important issue. And that is the patent trust asset aspect of this case, and whether or not there was or was not a violation of the district court's consent injunction. After I discuss that, Your Honor, I want to talk about the imperial delicto matters raised in this case. And then lastly, address questions of assignment and all those ways. So the first part, Your Honor, to understanding this case from a factual standpoint and from a legal is the consent order. The consent order in this case was entered into by West Central, who is not here today, and a group of patent trust creditors in this consent order imposed certain restrictions upon West Central. Basically called for its continued operation and liquidation for the benefit of trust creditors. In that consent order, in paragraph 10, district judge established a patent trust account where all the proceeds of West Central's sale of 50% of all proceeds from non-produce sales were already deposited into this account, and no distributions or withdrawals were allowed from that account whatsoever, unless they were especially approved in the consent order or by further order of the district court. I mean, how are the assignment rights, the litigation rights, not a patent trust item? Sure. Good question. I appreciate you asking that, Judge. The basis for the right to sue or a patent trust claim comes from a liability or accounts payable on behalf of West Central. When you look at the plain language of the patent statute, it says that the trust is comprised of the perishable agricultural commodities. That is the produce that the buyer receives physically. In fact, Packer uses the term received as the produce you exert possession and custody control over. And then stemming from that product, the buyer received, the receivables from the buyer to its customer upon resale, and any proceeds that the buyer receives from its resale of that product. So it is a limited and defined collateral. The right to sue is not in the Packer's definition of what a trust asset is. The right to sue is not included in any common law case that deals with what is or seeks to impose limitations or definition of what a Packer trust asset is. But if you have a right to sue, it can very much be a trust asset. Trusts all the time have acquired rights to sue, so why would this be treated any differently? The only right to sue that would benefit a trust would be something where the cause of action were, and this would be why the receivable of West Central, when he resells the product, also is a Packer trust claim. If that right to sue would be considered a Packer trust asset because if the money was collected, it would infuse or benefit the trust and all beneficiaries of the trust, as opposed to selling somebody's right to sue the trust. A claim against a trust debits the trust, hurts the trust in a way, because it is a beneficiary taking funds out of the trust, as opposed to the buyer selling the cause of action that the proceeds, if successful, would actually enhance the trust or add to it. And I think the congressional attempt to pack is telling on this issue, Your Honor, because the trust was imposed for the specific purpose of making sure that the buyers, in this case West Central, doesn't iterate to any type of financing arrangement that would allow a secured lender to come in and say, well, I have a secured interest or a lien on the produce, the receivable, or the proceeds, and then they would take that as a priority payment to head up the unpaid supplier. A lien from a secured lender or type person is not going to attach to a liability of West Central Produce, and that's one of the reasons why the type of claim that were at issue with the PROCAP agreement is not the same type of claim or Packet Trust asset at all. It is just completely, doesn't even fall into the asset side of the board. Why were the litigation rights effectively described as a Packet Trust asset in the PROCAP agreement? So the district court, in our opinion, kind of cherry-picked the language out of Section 500, out of the Bill of Sale, Your Honor. And when you look at the Bill of Sale in its entirety and you look at it with the consent order of the court, the court said you cannot, under Section 18, sell, West Central cannot sell these Packet Trust assets. And when you go to paragraph 25 of the consent order, it talks about the ability to sell assets and how the assets that West Central sells would be free and clear of all liens, claims of Packet creditors, and secured lenders. And it says the proceeds of those sales must be deposited into the Packet Trust account approved by the court in the consent order. The Section 5 that the district court cited talks about removing the claim, any claim that the Packet Trust creditors might have from that trust, and it creates a contractual obligation to deposit those funds into the Packet Trust account. So the language that the district court cherry-picked from in order to support It's really hard to say it's a cherry-picking. I mean, there are multiple parts of the Bill of Sale that said this is a, to treat it as a Packet Trust asset and talked about how these assets will now be more freely available because in return for them, we're now getting $100,000. I mean, the district court here was trying to freeze all this to be able to corral it. And then we have this side agreement that's taking assets out, and I can understand why the district court wasn't pleased with that. You know, and I can see from the outside looking in a while why this transaction might have been distasteful to the district court, but the part of the Bill of Sale that the district court cited was actually the effort of the parties to comply with the consent order in Paragraph 25, acknowledging that what's being sold is an asset that falls under Paragraph 25 and not an asset that falls under the prohibitions of Paragraph 18 of the consent order, acknowledging the contractual obligation to deposit those funds into the Packet Trust account. So there's no, maybe you intended for it to comply, but there was no effort to go through this as part of the process that the district court had set up for the disposition of these assets. Your client went ahead and did this and then filed a complaint seeking $4 million for an asset for some litigation rights that you purchased for $100,000. So I think the district court was probably pretty surprised to see that. In the district court's point specifically to the action of, and this will kind of go into a consignment, the district court was upset thinking that Produce Capital Group was somehow trying to take advantage of some wrongdoing, actually a specific wrongdoing, the failure of West Central to pay certain of its produce suppliers in order to make money. It seemed like if West Central didn't pay these corporations, that gave them a claim they didn't have, and then he tries to sell that claim to make money. That did seem, it struck the district court, even from Produce Capital Group's position, as distasteful. However, there's nothing wrong or illegal or violative of the court's order in that process. The actual wrongdoing that the district court cited, failing to pay, was a direct result of HSBC Bank taking approximately $12 million and seizing the liquid assets of West Central. And that action, at least as alleged in our complaint, directly led to West Central's inability to pay. And with that inability to pay... I agree with the district court that the bill of sale violated the consent order. Do you challenge the district court's authority or ability to avoid the bill of sale? Is that proper? We do not think that that was proper. We think that there's... We cited a couple cases in the appellate brief that says that the court should not use the heaviest method possible. So while it is within the court's power to do so, we believe that the application of discretion or application of power, in this instance, was too heavy-handed and inappropriate, and that there's plenty of lesser remedy means. We think it would be inappropriate to void the entire contract between these parties. As would you think that the district court should have done that? The district court should have allowed West Central to create value out of the liability and allow the claim to proceed against the trust. And if anything, Your Honor, the court should have allowed this case to move past the motion to dismiss stage and conduct a discovery, allow the parties to conduct a discovery, to flesh out the effect patterns related to whether or not there are any issues. But there should be some sort of sanction for violating the consent order. What kind of sanction would have been more appropriate? Your Honor, assuming and arguing, though, that the order was violated, and, of course, our opinion as a position is that we didn't violate anything, that a lesser penalty for that would have been to strike the provision of the contract. When you look at the bill of sale, the section that the court noted was an additional section that specifically addressed and recognized the package trust, the assets, and the rights that were pertinent to that. As a bail and suspender area, the court could have stricken that entire paragraph and said the parties have to live with the rest, and it would have left the assignment. Did you ask the district court to modify its order in some way? We did not, Your Honor. The district court came in, poured us out with prejudice, no leave to amend, and closed the door pretty significantly on our client. And, frankly, he did so at the same time with thinking that part of his capital group was somehow a bad actor or a participant in West Central's failure to advance bills following HSE's seizure of its liquid assets, but my client was branded as a bad actor for being a debt purchaser. And so we did not, respectfully, Judge, go back to the district court and seek a rehearing or reconsideration. We will turn it straight to this court, Judge. Okay, why don't we leave you some time for rebuttal? Thank you, Judge. We'll reserve two minutes. We'll hear from Mr. Queen. May it please the court. Dan Queen on behalf of Appellee Agency Bank. What Produce Capital is trying to do here is pretty egregious. This case arose because West Central purchased millions of dollars' worth of produce and then failed to pay its suppliers. That's what resulted in the creation of the pocket trust. By statute, it was created for and only for the benefit of unpaid suppliers. After the pocket trust arose, West Central settled payments with a number of those suppliers and obtained an assignment of whatever claims the suppliers had against the pocket trust. Just to pause you right there, Mr. Queen, so did those arrangements violate the consent order also? No, Your Honor. So why not? So West Central went and settled claims with some of the individual producers. Well, Your Honor, I apologize for interrupting. I should clarify. It is possible they violated the consent order if pocket trust assets were used to purchase those claims. I think that's a little bit of a factual question that the court does not need to resolve at this stage. The district court didn't see the district court addressing that one way or the other. I'm not sure if it was brought to the court's attention or if it was relevant to the disposition of the case. I don't see the court as definitively resolving that one way or the other. From the court's perspective, the relevant issue was with the transfer of trust assets from West Central to Produce Capital. Okay. I apologize for the detainee. You go ahead. No problem. So as part of that, and this is important to understand, as part of that original assignment agreement, the suppliers released their claims against West Central and its officers, and they only assigned their rights against HSBC and other third parties. So now West Central is sitting on these assignments, which were worth nothing to them. And why is that? Well, there are two reasons. First, the assignments were worth nothing to anybody, and that's because the pocket creditors accepted payment and they released their claims against West Central, and the pocket trust only benefits unpaid produce suppliers. Okay. But even if the assignments were worth anything, they were particularly useless to West Central. And Produce Capital, you know, says this in their reply brief, West Central would face potentially fatal legal challenges in pursuit of those claims. Quote, in West Central's hands, the rights were useless. So what did West Central do? It sold the claims to Produce Capital, which is now attempting to bring claims that it acknowledges West Central couldn't. Okay. Why are they useless? Couldn't West Central go after HSBC to return some of the funds back that would then increase the PACA trust? Not based on these claims, Your Honor. And the reason why is that the trust only arises for the benefit of unpaid pocket beneficiaries. Here, the pocket beneficiaries were paid. They were paid by West Central, which is the party, you know, who owed them money pursuant to the relevant contract. What about the producers who were paid? Well, the producers whose claims are subject to this part of the litigation. So Produce Capital is asserting claims on behalf of produce suppliers whose claims were paid by West Central as part of the assignment and release agreement. I'm assuming there were other producers that were not paid then. Correct. There were other producers that were not paid, and claims were separately resolved. The bank used to pay the other producers. I'm sorry, Your Honor. I missed the first part of that question. The claims against the bank used to pay the other producers. So, yes, exactly. So there were separate claims that were brought by all the other packet creditors against West Central and HSBC. Those claims were resolved through a settlement and are, you know, not part of this portion of the case. So essentially what PROCAP is doing here, they're arguing in essence that where a party can't assert its own claims, defenses can essentially wander those claims by selling them to a third party. And that's a particularly striking argument here, where the purported claims against HSBC Bank are only second-degree to those of West Central. And West Central received a release of its own liability as part of the assignment agreement. But as the district court found, they said the packet creditor's claims were worth anything, but there are two reasons they could not assert those. First, as was discussed quite a bit a few minutes ago, the packet creditor's claims were PACA trust assets. So under the PACA content order entered by the court, read by West Central, they couldn't be transferred without the court's approval. You know, PROCAP is claiming that they weren't trust assets. They say that the PACA assets were limited to the terms of commodity-related liquid assets. I mean, preliminary, these were commodity-related. They weren't like the way that's demonstrated by the fact that West Central was able to purchase and sell them in such a short time period. But regardless, the term commodity-related liquid assets doesn't appear anywhere in PACA. It doesn't appear in the statute. It doesn't appear in the regulations. And courts have consistently found that trust assets are pretty broadly defined and encompass things well beyond what PROCAP is claiming here. Contrary to PROCAP's position, the right to recover on the packet creditor's claim was a trust for at least three reasons. First, they're claiming the right to recover funds from HSBC banks for the benefit of the packet trust. And it's black-letter law that the right to recover a trust asset is itself a trust asset. That receiving a trust, which we quote in our brief, says a cause of action that may be brought on behalf of the trust is itself a trust asset. And any recovery of the trust assets would be shared pro rata with PACA trust beneficiaries. To the definition of trust asset, though, PROCAP's counsel doubted this a little bit in his argument. The definition of trust asset in the consent order, which parallels the definition of trust asset in the PACA regulation, encompasses receivables and proceeds from the sale of commodities. So beyond those basic principles of trust law, here, exactly what was purchased from the packet creditors is the right to receive payment based on the sale of their goods. That's receivable, and that's a proceed from the sale of commodities. Can I ask you a question? In your knowledge of the states in this area, is there a market for this kind of debt? Is this debt commonly bought and sold? Here we have a consent order overlay, but do you happen to know the answer? Yes, Your Honor. I mean, it's fair to say that PACA claimants who would have claims against their suppliers, or rather their purchasers, there is a market out there for PACA claimants to sell their claims to third parties. I think that's different from what we've done here, what has happened here, where they just settled their payment with the party that owed the money. But say, for example, if the PACA claimants here had sold their claims directly to produce capital, we wouldn't be in this situation, and that would much better reflect what the PACA market actually looks like. Can I ask a question? Is this an R.A. Delicto ruling? Yes, Your Honor. What precisely is the wrongdoing that West Central was accused of doing? The wrongdoing here is West Central's own failure to pay, right? So the PACA trust asset, the PACA trust arose in the first place. The only reason it exists is because West Central was not paying its produce suppliers. And the only reason HSBC is sending money is because it made the mistake of lending money to West Central. And, you know, obviously, I don't... If West Central didn't have the money, how could it have paid? Well, there's no allegation that they were all fraudulently, right? Or in bad faith, they just didn't have the money to pay back the producers. Well, Your Honor, I would suggest that, you know, where N. period delicto is applied in the contractual context, the failure to pay under a contract is inequitable. It is unlawful. It is something that would give rise to a liability. And, you know, here, where the revolts... Under California law, there's the concept of efficient breaches, right? So that if they can't pay on the contract, a breach sometimes makes sense. And I don't think California says that that's illegal or a wrongdoing. It's just the way business works. Well, Your Honor, if there were an efficient breach situation, then it would be West Central that would be paying the liability. And, in fact, that's sort of what they did in this assignment agreement, right? They settled their claims. They settled payment. They essentially have paid the unpaid produce suppliers. You know, it would not be an efficient breach story if, you know, you would have to modify that doctrine to say, oh, I can settle my claim, you know, for pennies on the dollar and then bring in my lender to pay the rest. No, that wouldn't be an efficient breach. That would just be transferring the liability that you owe to your produce supplier on to a third party to whom you yourself owe money. So I would respect, you know, suggest that that principle does not apply. Briefly, to touch on the other in-carrying delecto points here, though, before I run out of time, you know, again, PROCAP itself acknowledges in its papers that in West Central's hands, the rights were useless. PROCAP says they shot the rights on the open market, found a purchaser for fair market value. I'd just like to point out that that's an astonishing admission. PROCAP acknowledges that West Central, from whom it took the supposed rights to assert the pocket claims, could not have asserted those claims itself if it had the ability to sell those claims on the open market. The implications if that were true would be astonishing. Essentially, anytime anyone had one of these contributory negligence, unclean hands, in-carrying delecto, or similar effects, they could just sign the rights to an innocent third party. You know, I could sell claims for $100,000 to a third party, ask them to take a 5%, you know, administrative fee to pursue those claims on my behalf, and then they could just pay the funds right back to me. That would be entirely permissible under the regime that PROCAP's counsels proposed. And then, you know, a final point I just make is that, you know, their principal argument really is that PROCAP doesn't stand in the shoes of West Central. They stand in the shoes of the original signees. First off, again, that wouldn't solve their problem because of this basic problem with the original underlying assignment agreement. But putting that aside, PROCAP is just plain wrong about how assignments work. The black letter law is that you stand in the shoes of your assigner, not your assigner's assigner. While in many cases it's true that they're an assignment, you can get, you know, some or all of the rights  those are subject to the limits imposed by your intermediary assignees. And none of PROCAP's cases say anything to the contrary. So I'm out of time and I'll leave it at that, Your Honors, unless you have further questions. Thank you very much. Mr. Queen, let's hear from Mr. Lewis. I plead the court, Dennis Lewis, for the plea, Taylor Farms Retail, Incorporated. I don't have much to add, Your Honors. I just wanted to address one point that was raised in PROCAP's opening brief, which is the argument that one of the primary purposes behind PACA is the ability of PACA creditors to transfer and assign PACA debt to third parties. And while I agree that PACA debt is assignable, I disagree that that's the primary purpose behind PACA. The primary purpose behind PACA in its 1984 amendment was to protect suppliers of fresh produce in two ways. Number one, by giving them super priority over all other creditors of a produce buyer that fails to pay for produce. And number two, by requiring that the produce buyer hold in trust for the benefit of all, not some, but all produce-related assets until all unpaid suppliers are paid. And that all unpaid suppliers language comes from the actual text of the PACA statute. And that's 7 U.S.C. 499E subpart C 2. What is your client's interest in this particular dispute here? Taylor Farms was a PACA creditor which filed an objection to the claim of, the PACA claim of PROCAP which the court declared was moot in light of HSBC's motion to dismiss. Now PACA was not intended to protect produce buyers such as West Central which was in dire financial strains owing substantial amounts of money to multiple farmers from engaging in conduct that really had the practical impact of depleting the purpose of the PACA trust for the benefit of West Central and a portion of PACA claimants who were not  for the PACA trust. That is exactly what happened here. West Central pays $1.7 million in funds to settle and they did this between March and May of 2020 when a consent order was entered into in April prohibiting the extortion of all PACA claimants. 42 creditors which represented about $4 billion at the time was $12 billion a decade. So they settled with 42 creditors $1.7 million that in June of 2020 after the consent order is entered PROPET purchases these $4 million claims for $100 K. And then PROPET comes back into the picture and sues both West Central which basically is suing itself and HSBC for $4 million. And I would respectfully submit that that force of conduct has the practical impact of depleting the corpus of the PACA trust which is detrimental to all unpaid suppliers. Thank you Mr. Lewis. I think we have your argument and we would like you to go a little lower. Thank you your honors. I think there are a couple of things I want to address. First of all the West Central used non PACA trust assets in connection with Mr. Lewis. The non PACA trust  are used to purchase non PACA trust assets. That asset is not impressed with a PACA trust. So there is no question from denying the challenge I'm defining the district court ruling that that is not correct. The other thing we talked about in the motion to dismiss is the funds paid by West Central to these folks were to resolve the issue of trustee liability not to resolve the issue of the unpaid invoice itself. And that is recognized in the restatement of trust. And so PACA applies to the general trust principles to the extent they are not inconsistent with PACA. We also talked about the receivables because they are a receivable of a purchase transaction albeit flowing from a seller to a buyer. And that's not right. The PACA trust principle     purchase transaction. And the reason we know that is true is because to the extent any one of those 42 sellers generate a receivable for a product that they resold to West Central that becomes part of their trust and their obligation to a beneficiary supplier standing behind them in the supply chain can't have the same asset being part of the two different trust races. So we know that the accounts payable were not trust assets of West Central in any way. And so we will stand in recess. Thank you all. Thank you. Thank you. Thank you.
judges: BRESS, BUMATAY, Gleason